IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-76

No. 192A20

Filed 18 June 2021

IN THE MATTER OF: M.S.E. and K.A.E.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 9 March 2020 by Judge Monica M. Bousman in District Court, Wake County. This matter was calendared in the Supreme Court on 22 April 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mary Boyce Wells for petitioner-appellee Wake County Human Services.*

*R. Bruce Thompson II for appellee Guardian ad Litem.*

*Kathleen M. Joyce for respondent-appellant mother.*

EARLS, Justice.

¶ 1 Respondent appeals from an order terminating her parental rights in her children, M.S.E. (Mary) and K.A.E. (Kevin).[1] We affirm.

## I.    Background

¶ 2 Kevin was born in August 2010, and Mary was born in May 2017. On 8 May 2018, Wake County Human Services (WCHS) filed a juvenile petition alleging that Kevin and Mary were neglected juveniles. The petition alleged that on 9 December

[1] Pseudonyms are used to protect the identity of the juveniles and for ease of reading.

2017, WCHS received a report that respondent, Kevin, Mary, and respondent's ten-year-old son[2], Gary, had been expelled from the Salvation Army homeless shelter based on respondent's failed drug screens. Respondent took the children briefly to a hotel but ran out of money. Kevin and Mary were placed in a safety placement with respondent's cousin, and Gary was placed with his father. Respondent had a history of homelessness and transiency, repeatedly placing her children with relatives for extended periods of time due to housing and income instability. She acknowledged daily use of marijuana since the age of fourteen and use of cocaine after 2014. Respondent had been diagnosed with depression, post-traumatic stress disorder, and anxiety.

¶ 3        The petition further alleged that while respondent agreed to participate in substance abuse and mental health treatment, she failed to do so. The Salvation Army connected respondent-mother with North Carolina Recovery Services for Substance Abuse Intensive Outpatient (SAIOP) treatment, but she did not attend any of the scheduled appointments. She also failed to appear for appointments with WCHS for In-Home Services. On 13 March 2018, respondent experienced a mental health crisis and went to Holly Hill Hospital for evaluation. She was not admitted but was recommended to immediately schedule an appointment with an outpatient

---

[2] Respondent's ten-year-old son is not a subject of this appeal.

therapist, a psychiatrist, and a SAIOP program. She did not follow any of the recommendations. On 14 March 2018, she went to Healing Transitions, a residential substance abuse treatment program, but she left after five days. By this time, Kevin and Mary had been in their safety placement for four months, and respondent had only visited them on three occasions.

Following hearings on 15 June 2018 and 9 July 2018, the trial court entered an order on 4 September 2018 adjudicating Kevin and Mary to be neglected juveniles and continuing custody with WCHS. On 6 August 2018, Kevin was transferred to a therapeutic foster home after it was determined that he required a higher level of care than his safety placement could provide. The trial court conducted a review hearing on 1 October 2018, and entered an order on 23 October 2018 finding that respondent had failed to comply with any drug screen requests since the hair screen specifically ordered at the conclusion of the dispositional hearing. She admitted to ongoing, regular use of marijuana approximately three times per week, and the result of a hair sample screen was positive for marijuana and cocaine. The trial court also found that returning Kevin and Mary to the home would be contrary to their health and safety. The primary permanent plan was set as reunification, with a secondary plan of adoption.

Following a review hearing on 25 March 2019, the trial court entered an order

on 22 April 2019 finding that respondent continued to use marijuana and had only complied with one of five drug screens requested by WCHS since the prior review hearing. Respondent reported use of cocaine on 22 February 2019. She had participated in five of sixteen possible parenting coaching sessions, and the sessions she did attend were productive, resulting in "noticeable improvements" in her interactions with the children. On 23 May 2019, Mary was transferred to a foster home after her safety placement could no longer care for her.

¶ 6 On 30 September 2019, WCHS filed a motion to terminate respondent's parental rights in Kevin and Mary. WCHS alleged: (1) respondent had neglected the children, and it was probable there would be a repetition of neglect if they were returned to her care, *see* N.C.G.S. § 7B-1111(a)(1) (2019): (2) respondent had willfully left the children in foster care for more than twelve months without showing reasonable progress under the circumstances to correct the conditions that led to their removal, *see* N.C.G.S. § 7B-1111(a)(2); and (3) the children had been placed in WCHS custody and respondent had for a continuous period of six months next proceeding the filing of the motion willfully failed to pay a reasonable portion of the cost of care for the children although physically and financially able to do so, *see* N.C.G.S. § 7B-1111(a)(3).

¶ 7 The motion to terminate respondent's parental rights came on for hearing on

16 and 29 January 2020. On 9 March 2020, the trial court entered an order concluding that grounds existed to terminate respondent's parental rights in Kevin and Mary pursuant to N.C.G.S. § 7B-1111(a)(1)–(2). The trial court determined it was in Kevin and Mary's best interests that respondent's parental rights be terminated, and the court terminated her parental rights.[3] *See* N.C.G.S. § 7B-1110(a). Respondent appeals.

## II.     Analysis

### A.     Rule 17 Guardian *ad Litem*

Respondent's first argument on appeal is that the trial court abused its discretion by failing to, sua sponte, conduct an inquiry into whether she should be appointed a guardian ad litem (GAL) under Rule 17 of the North Carolina Rules of Civil Procedure to assist her during the termination hearing. She contends that once the trial court learned the results of a psychological evaluation she underwent in December 2019, it had a duty to inquire into her competency.

Section 7B-1101.1(c) of the North Carolina General Statues permits the trial court "[o]n motion of any party or on the court's own motion" to appoint a GAL for a parent who is incompetent in accordance with N.C.G.S. § 1A-1, Rule 17. N.C.G.S. §

---

[3] The trial court also terminated the parental rights of Kevin and Mary's fathers, but they are not parties to this appeal.

7B-1101.1(c). An "incompetent adult" is defined as one "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, intellectual disability, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition." N.C.G.S. § 35A-1101(7) (2019).

"A trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis*." *In re T.L.H.*, 368 N.C. 101, 106–07 (2015) (alterations in original) (quoting *In re J.A.A.*, 175 N.C. App. 66, 72 (2005)). "A trial court's decision concerning whether to conduct an inquiry into a parent's competency" and "[a] trial court's decision concerning whether to appoint a parental [GAL] based on the parent's incompetence" are both reviewed on appeal for abuse of discretion. *Id.* at 107. "An '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.'" *Id.* (alteration in original) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)). Further, the abuse of discretion standard is appropriate here because the evaluation of an individual's competence "involves much more than an examination of the manner in which the individual in question has been diagnosed by mental health professionals."

*In re T.L.H.*, 368 N.C. at 108. Also important are factors such as the individual's behavior in the courtroom, how clearly they express themselves, whether they appear to understand what is going on, and whether they can assist counsel. *Id.,* at 108–09.

¶ 11 Here, respondent relies heavily on the testimony of a WCHS social worker who testified at the termination hearing. The social worker testified that on 4 December 2019, respondent completed a psychological assessment with Dr. Robert Aiello. Dr. Aiello determined respondent had borderline intellectual functioning. The social worker testified that Dr. Aiello recommended a parenting education program which focused on individuals with some cognitive impairments, "delivering the information on more of a functional level for the parents." Dr. Aiello further recommended that respondent identify a consistent support person who could provide her with "direction and guidance" with complex decisions regarding the needs and welfare of her children and with "daily living and important decision-making"; that if respondent was awarded disability, she would require a payee to assure proper use of funds; and that WCHS personnel and professional parties working with respondent review written documents with her to assure understanding of the information being presented.

¶ 12 Respondent argues that the results of Dr. Aiello's assessment and his recommendations indicate she needed the assistance of a Rule 17 GAL. Respondent also contends that there was other evidence to suggest she might be legally

incompetent: she needed assistance from vocational rehabilitation, she believed she needed a disability instructor due to her learning comprehension disability in order to pass the General Educational Development Test, and a WCHS social worker noted in a March 2019 permanency planning hearing report that respondent "does not understand why this case was initiated or continues, and does not understand why she needs to pursue services."

After careful review of the record, we believe the record contains "an appreciable amount of evidence tending to show that [respondent was] not incompetent" at the time of the termination hearing. *In re T.L.H.*, 368 N.C. at 108–09. First, the WCHS social worker testified to some "assets" noted by Dr. Aiello in his assessment of respondent. Dr. Aiello's assessment noted that respondent acknowledged her history of homelessness, "made statements indicating she understands her children need a safe and stable living environment[,]" and had established "some supportive relationships with others." Dr. Aiello observed that respondent was "resourceful and resilient and should be able to address her problems if she remains motivated to do so."

Second, the record indicates that respondent exercised appropriate judgment when she informed the Child and Family Team of WCHS on 30 April 2018 that she did not feel ready to take the children back due to her unstable housing and lack of

employment, requesting that they remain in her cousin's home. *See In re T.L.H.*, 368 N.C. at 109 (noting that the respondent had exercised "proper judgment" in allowing the petitioner to take custody of respondent's child shortly after his birth based upon concerns about the safety of her home).

¶ 15        Third, the trial court's view of respondent's competency is supported by the fact that she attended all hearings related to this matter. Her presence gave the trial court ample opportunity to observe and evaluate respondent's capacity to understand the nature of the proceedings. *See In re Q.B.*, 375 N.C. 826, 834 (2020) (stating that the respondent's attendance at all hearings related to the matter supported her competency and "gave the trial court a sufficient opportunity to continue to observe her capacity to understand the nature of the proceedings").

¶ 16        Fourth, respondent testified at the termination hearing on 29 January 2020, and her testimony showed that she understood the questions addressed to her and had the ability to respond in a clear and cogent manner. Her courtroom conduct and responses provided no reason to believe that she did not understand the nature of the proceedings. For instance, respondent's testimony suggested that she understood the reasons why Kevin and Mary were removed from her care. *See id*, 375 N.C. at 834 (stating that the respondent's testimony at the termination hearing demonstrated that "she understood the nature of the proceedings and her role in them as well as

her ability to assist her attorney in support of her case"); *see also In re T.L.H.*, 368 N.C. at 109 (stating that the respondent's testimony at the permanency planning hearing was "cogent and gave no indication that she failed to understand the nature of the proceedings in which she was participating or the consequences of the decisions that she was being called to make"). Based on the evidence in the record, respondent has failed to demonstrate that the trial court abused its discretion by failing to, sua sponte, conduct an inquiry into whether she should be appointed a Rule 17 GAL.

**B.      Grounds for Termination**

Respondent next argues that the trial court erred by concluding that grounds existed to terminate her parental rights in Kevin and Mary. "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388,

392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 18    Here, the trial court determined that grounds existed to terminate respondent's parental rights based on neglect and willfully leaving the children in foster care for more than twelve months without making reasonable progress to correct the conditions that led to their removal. N.C.G.S. § 7B-1111(a)(1)–(2) (2019). We begin our analysis by determining whether grounds existed to terminate respondent's parental rights on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 19    A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in pertinent part, as a juvenile

> whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare[.]

N.C.G.S. § 7B-101(15) (2019).

In certain circumstances, the trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g., In re K.C.T.*, 375 N.C. 592, 559–600 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, for other forms of neglect, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019). In this situation, "evidence of neglect by a parent prior to losing custody of a child— including an adjudication of such neglect— is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). After weighing this evidence, the court may find the neglect ground if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020). Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for termination based upon its consideration of any evidence of past neglect and its determination that there is a

likelihood of future neglect if the child is returned to the parent. *Id.* at 841 & n.3. "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.A.*, 374 N.C. 865, 870 (2020) (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637 (2018)).

¶ 21      In the present case, the trial court found in its termination order that Kevin and Mary had been in WCHS custody since 8 May 2018 and that the circumstances that caused them to be in foster care were: respondent's chronic substance abuse; chronic homelessness of respondent and the children, due in part to respondent's substance abuse; untreated mental health needs of respondent and Kevin; and undetermined paternity of the children. The children were adjudicated neglected on 4 September 2018. Respondent was ordered to: have supervised visitation with the children a minimum of one hour per week; fully participate in a PEP assessment and comply with recommendations; complete a substance abuse assessment and comply with recommendations; demonstrate skills and lessons learned in parenting education in her interactions with the children and professionals involved in the case, and in respondent's life choices; refrain from the use of illegal and impairing substances and submit to random urine and hair sample drug screens; comply with services and recommendations by vocational rehabilitation; follow up with recommended medical care for herself; refrain from criminal activity, and comply

with requirements related to pending charges or convictions; obtain and maintain safe, stable housing suitable for herself and the children; obtain and maintain stable, legal income sufficient to support herself and her children; and maintain regular contact with the assigned WCHS social worker.

¶ 22     The trial court found that respondent had failed to take advantage of opportunities to engage in services since the filing of the juvenile petition. Although she complied with the interview portion of a substance abuse assessment with WCHS on 31 May 2018, she failed to comply with the drug screen required to complete the assessment. Based on the interview, respondent was diagnosed with marijuana use disorder (moderate) and cocaine use disorder (in remission) and was recommended to submit to random drug screens. In the Fall of 2018, respondent completed another assessment at North Carolina Recovery Support Services (NC Recovery), but she did not follow through with services at that program. On 4 April 2019, respondent participated in a reassessment of her substance abuse and was diagnosed with cannabis use disorder (moderate, in remission) and cocaine use disorder (mild, in remission). While it was recommended that she participate in substance abuse, mental health, and medical services at Fellowship Health, she failed to participate in any services at Fellowship Health.

¶ 23        Also in April 2019, respondent participated in a comprehensive clinical assessment at Southlight. It was recommended she participate in SAIOP, but she only attended one session and discontinued participation. In August 2019, respondent was again referred to NC Recovery for substance abuse and mental health services, but she did not comply with the recommendations of the program. She failed to demonstrate that she made progress in her mental health and substance abuse treatment. Since July 2018, respondent had been asked to complete twenty-four drug screens, but only completed seven. Four of the seven screens were positive for marijuana, and one was positive for cocaine. She continued to miss drug screens as recently as 31 December 2019.

¶ 24        The trial court further found that respondent missed three appointments with the PEP. After the third missed appointment, the PEP provider was no longer willing to provide an evaluation to respondent, and respondent was ordered to participate in a psychological evaluation in lieu of the PEP. She did not complete the psychological evaluation until December 2019 and missed her appointments for the interpretive session with the psychologist. Respondent eventually completed the one-on-one parenting education after two unsuccessful attempts. However, she demonstrated that she did not understand the needs of her children, including the impact her words have on them. Despite being repeatedly instructed to refrain from telling the children

they would be coming "home," she continued to tell them they were coming home for her own benefit. Her comments about the children coming to live with her were "closely correlated" with Kevin engaging in self-destructive behavior. Respondent was dismissive of Kevin's mental health needs. She participated in one therapy session with Kevin and never contacted the therapist again. Finally, the court found that respondent had obtained appropriate housing in May 2019.

¶ 25 Respondent challenges multiple findings of fact made by the trial court. First, she challenges portions of findings of fact 16, 22, and 31 as not being supported by clear and convincing evidence. These findings provide as follows:

> 16. [Respondent] has had multiple opportunities to engage in services since the filing of the juvenile petition, but she did not take advantage of those opportunities.
>
>  . . . .
>
> 22. In August 2019, [respondent] was again referred to NC Recovery for substance abuse and mental health services, but she did not comply with the recommendations of that program, including skipping an appointment on December 20, 2019 for a psychiatric evaluation. The psychiatric evaluation could have determined her need for medication, which could have reduced her feeling the need to self-medicate with marijuana and other substances. She did not call to cancel or reschedule the treatment.
>
>  . . . .
>
> 31. [Respondent] has not demonstrated that she has made progress in her mental health and substance abuse

treatment.

Specifically, respondent challenges the portions of the foregoing findings which provide she "did not take advantage" of opportunities to engage in services, "did not comply with the recommendations" of NC Recovery, and "has not demonstrated that she has made progress in her mental health and substance abuse treatment."

¶ 26 Unchallenged finding of fact 19, supported by testimony from a WCHS social worker, establishes that in the fall of 2018, respondent completed an assessment with NC Recovery but failed to follow through with any services. A WCHS social worker also testified that respondent was referred to Southlight in early 2019. Respondent completed an assessment, and it was recommended she complete SAIOP. Instead of participating in SAIOP, respondent "opted to elect for a lower level of care" choosing to engage in a weekly relapse prevention group and monthly individual therapy. She had one visit on 12 March 2019 and did not engage in any further services at Southlight. Unchallenged finding of fact 20, which is also supported by testimony from a WCHS social worker, demonstrates that on 4 April 2019, respondent participated in a substance abuse assessment, and it was recommended she participate in substance abuse, mental health, and medical services at Fellowship Health. However, she did not engage in any services at Fellowship Health. The social worker further testified that respondent re-engaged with NC Recovery in August

2019, and she was assigned a therapist to have outpatient therapy. While she had been "more engaged" in the service than she had been in the past and was more consistent with her outpatient therapy, respondent missed a psychiatric evaluation on 20 December 2019 and had not rescheduled it at the time of the termination hearing. Based on the foregoing unchallenged findings and evidence, there was clear, cogent, and convincing evidence to support the trial court's findings that respondent failed to take advantage of multiple opportunities to engage in services, she did not comply with the recommendations made by NC Recovery, and she did not make reasonable progress in her mental health and substance abuse treatment.

¶ 27        Respondent also challenges finding of fact 23, which provides as follows:

> 23. [Respondent] was prescribed Zoloft by the Wake Med high risk pregnancy clinic to address symptoms of depression. [Respondent-mother] is not compliant with that prescription, citing concern that the medication could harm the baby she delivered in November 2019, in spite of it being prescribed by professionals who were treating her for the pregnancy. [Respondent] did not have concern that continued use of marijuana would harm the baby.

She argues that the trial court erred by faulting her for not taking her Zoloft prescription when there was no record evidence to show she had active symptoms of depression at the time. However, clear and convincing evidence supports this finding and establishes respondent's symptoms of depression at the time. Respondent testified that the high-risk pregnancy clinic placed her on Zoloft based on her history

of depression. She admitted that during her pregnancy, she "dealt with depression at times." In addition, a WCHS social worker testified that in August 2019, respondent was prescribed Zoloft by a physician at WakeMed Hospital because she had "endorsed some depressive symptoms."

¶ 28          Respondent further challenges finding of fact 21, which states:

> 21. [Respondent] participated in a Comprehensive Clinical Assessment (CCA) at Southlight in April 2019, which recommended that she participate in Substance Abuse Intensive Out-Patient (SAIOP) treatment. [Respondent] was noted to smell of marijuana when she arrived for the assessment; following a break during the assessment, [respondent-mother] returned with an even stronger odor of marijuana than when she first arrived. She attended one session of SAIOP, and discontinued participation. [Respondent] claims that the program facilitator told her that the program is not available for those who only use marijuana. The Court takes judicial notice that Southlight provides services to participants sentenced to drug treatment court, which includes users of only marijuana. Additionally, it is disingenuous for the mother to claim that she uses only marijuana. While marijuana might be her substance of choice, she tested positive for marijuana and cocaine when she took the drug screen to complete the CCA at Southlight, as well as other of the few other screens she completed.

Respondent argues that the trial court erred by taking judicial notice that Southlight provides services to drug treatment court participants who use only marijuana.

¶ 29          "[G]enerally a judge or court may take judicial notice of a fact which is either so notoriously true as not to be the subject of reasonable dispute or is capable of

demonstration by readily accessible sources of indisputable accuracy." *West v. G. D. Reddick, Inc.*, 302 N.C. 201, 203 (1981). This Court has held that "[a] matter is the proper subject of judicial notice only if it is 'known,' well established and authoritatively settled." *Hughes v. Vestal*, 264 N.C. 500, 506 (1965). Under these principles and based on the record before us, we are unable to say that the matter of whether Southlight provides services to participants of drug treatment court who use only marijuana is a proper subject of judicial notice. Nevertheless, we conclude the trial court's unsupported finding is not prejudicial in light of the remaining, unchallenged portions of finding of fact 21 which establish that respondent tested positive for marijuana *and* cocaine when she took the drug screen to complete the CCA at Southlight. *See Tripp v. Tripp*, 17 N.C. App. 64, 67 (1972) (holding that although the trial court took improper judicial notice of an attorney's special competence and skill, that decision did "not detract from the other facts found"). Thus, her explanation that she discontinued participation in SAIOP treatment because the program was not available for users of only marijuana is unavailing because she demonstrably used cocaine as well.

¶ 30     Respondent also challenges findings of fact 24 and 26 which provide as follows:

> 24. [Respondent] missed three appointments with the Parent Evaluation Program (PEP), for an evaluation that would have been used to determine the services best suited to assist her in reunification. After the third missed

> appointment, the PEP provider was no longer willing to provide an evaluation to [respondent]. It was then ordered that [respondent] participate in a psychological evaluation in lieu of the PEP. [Respondent] did not complete the psychological evaluation until December 2019; she missed her appointment for the interpretive session with the psychologist, which would have helped her understand what was recommended and why.
>
>  . . . .
>
> 26. [Respondent] did eventually complete 1:1 parenting education after two attempts. During the first opportunity to participate in these sessions, [respondent] attended seven of 25 possible sessions. [Respondent] was discharged from the program after multiple cancellations and no-shows for appointments. Another referral was made in September 2019 for [respondent] to resume 1:1 parenting education sessions; [respondent] attended four sessions, and cancelled six sessions, including one for the week of the first date of this hearing. Had the psychological evaluation been completed by [respondent] in a timely manner, then the sessions could have been tailored to more specifically meet [respondent's] needs.

Respondent contends that the trial court "blames" her for not completing her psychological evaluation in a timely manner but fails to acknowledge delays on the part of WCHS, respondent's attendance at an evaluation with Dr. Aiello three weeks after giving birth, respondent's engagement in weekly parenting coaching while caring for a newborn, and the reason she missed her interpretive session with Dr. Aiello—because she could not get to the office on time by bus.

We note that the "trial court need not make a finding as to every fact which

arises from the evidence; rather, the court need only find those facts which are material to the resolution of the dispute." *Witherow v. Witherow*, 99 N.C. App. 61, 63 (1990), *aff'd per curiam*, 328 N.C. 324 (1991). Here, the trial court found the facts that were material to resolution of this case. Furthermore, there was clear, cogent, and convincing evidence to support findings of fact 24 and 26. A WCHS social worker testified that after respondent missed multiple appointments for the PEP assessment, the PEP provider decided that it would no longer provide respondent an assessment. In lieu of a PEP assessment, WCHS recommended a psychological assessment, and respondent completed the psychological assessment with Dr. Aiello on 4 December 2019. However, respondent missed the interpretive session with Dr. Aiello that was scheduled for 9 January 2020. A WCHS senior practitioner and parenting coach also testified that respondent was referred in November 2018 for one-on-one parent coaching sessions, but respondent only completed seven sessions. Respondent was terminated from the program due to ongoing cancellations and no-shows. A second referral occurred in September 2019, and respondent attended four sessions and canceled or rescheduled six sessions.

¶ 32          Respondent next contends that the trial court's findings of fact 27, 29, 30, and 34 focus on Kevin's mental health problems, but that the trial court's "narrow focus" on her as the source of Kevin's problems is not supported by the record. The

challenged findings provide as follows:

27. [Respondent] has demonstrated that she does not understand the needs of her children, including the impact her words can have on them. [Respondent] was repeatedly instructed to not say anything to the children about them coming "home". She states that she would continue to tell them that they were coming home in order to give them hope. In reality, she made these statements for her own benefit. Her comments about the children coming to live with her were closely related to [Kevin] engaging in self-destructive behavior that, on at least two occasions, resulted in him requiring hospitalization for mental health treatment to prevent him from harming himself. Most recently, in December 2019, she gave [Kevin] [the] impression that he might return to her care at the next scheduled review hearing in March 2020. Soon after that, he became so out of control that he tried to wrap a seatbelt around his neck to suffocate himself. This resulted in a nine day hospitalization to get him stabilized. He was previously hospitalized at Holly Hill due to his grabbing knives and wanting to hurt himself.

. . . .

29. [Kevin] is relatively stable when he is unaware of court hearings or is not told anything that would indicate or imply that he is returning to his mother's care.

30. [Respondent] is dismissive of [Kevin's] mental health needs, and believes that his behavior is due only to his wanting to return home. To the contrary, his behavior, and the timing thereof, indicates that he is frightened to return to her care.

. . . .

34. [Respondent] participated in one therapy session with

> [Kevin]. [Kevin] began the session feeling nervous, and became increasingly "closed off" as it progressed. He indicated to the therapist that he was afraid he would get in trouble if he said what he wanted to say. At the conclusion of that session, the next appointment was scheduled with [respondent's] input, and she indicated that she would attend. [Respondent] did not attend that appointment, which hurt and disappointed [Kevin]. She never contacted the therapist again. The relationship required much more than one session to address [Kevin's] anxiety about being reunified with his mother.

¶ 33      At the termination hearing, a WCHS social worker testified that there were concerns respondent was giving the children false hope about being reunited with her. The social worker discussed these concerns with respondent, explaining that respondent's comments to the children about them coming "home" negatively impacted Kevin's emotional well-being. Respondent acknowledged that while she could not "guarantee" the children would be coming home, she would continue to tell them they were coming "home" in order to "instill hope" in them. The WCHS social worker further testified that respondent's comments created "distress" for Kevin which manifested in self-harm and destructive behaviors, such as breaking doors, kicking furniture, and pulling down rods in the closet. Most recently, respondent told Kevin that he would be coming "home" in March 2020, and thereafter, Kevin attempted to wrap a seatbelt around his neck and had to be hospitalized. Based on the testimony of the WCHS social worker, the trial court reasonably inferred that

respondent's comments were "closely correlated" to Kevin's self-destructive behavior. *See In re D.L.W.*, 368 N.C. 835, 843 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom). These challenged findings of fact are supported by clear, cogent, and convincing evidence in the record.

¶ 34     Respondent also argues that the trial court's findings regarding Kevin's mental health issues are insufficient because the trial court failed to make findings about a gap in Kevin's therapy between May and September 2019 and failed to address whether her intellectual disability impacted her understanding of Kevin's needs. However, as stated above, the trial court is not required to make a finding of every fact that arises from the evidence. *See Witherow*, 99 N.C. App. at 63.

¶ 35     Respondent further contends that there was no evidence to support the finding that respondent offered the children the hope of coming home for her own benefit. However, a WCHS social worker testified that respondent refused to stop telling her children they were coming home, despite warnings of its negative effects on Kevin, because "she believes that she can get her kids back one day. So she's gonna just keep saying it." Thus, it was reasonable for the trial court to determine that respondent continued to make these remarks for her own benefit, where she was fully advised that making such statements was not beneficial for the children and, in fact, had been

very detrimental to them. *See In re D.L.W.*, 368 N.C. at 843 (trial judge has the responsibility to determine the credibility and weight of testimony as well as "the reasonable inferences to be drawn therefrom.").

¶ 36    Respondent also argues that in finding of fact 34, the trial court detailed a March 2019 therapy session respondent attended with Kevin and erroneously found that the next appointment was scheduled with her input, and she indicated she would attend. Kevin's therapist testified that in March 2019, respondent joined Kevin in therapy, and she left that session "with the next appointment time." Respondent indicated to the therapist that she "wasn't sure if she'd be able to make it, but she was gonna do her best to try." Thus, we disregard the portion of finding of fact 34 providing that "the next appointment was scheduled with [respondent's] input, and she indicated that she would attend." *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing evidence).

¶ 37    Next, respondent argues that the trial court's challenged findings of fact and uncontested findings are insufficient to support its conclusion that her parental rights were subject to termination based on neglect. Respondent does not challenge the children's prior adjudication of neglect. Rather, she contends that the evidence does not support the trial court's determination that there was a likelihood of future

neglect if the children were returned to her care.

¶ 38        Here, the trial court concluded that:

> 54. There are facts sufficient to warrant a determination that grounds exist for the termination of parental rights, said grounds as follows:
>
> . . . .
>
> c. The parents neglected the children within the meaning of N.C.G.S. § 7B-101(15), and it is probable that there would be a repetition of neglect if the children were returned to the care of the parents.

¶ 39        In support of this conclusion, the trial court made numerous findings concerning the lack of progress respondent made toward satisfying the requirements of her case plan. The findings are either unchallenged, and therefore binding on appeal, or supported by clear, cogent, and convincing evidence as previously discussed.  In unchallenged finding of fact 13, the trial court identified the steps that respondent was required to complete in order to achieve reunification. Among these requirements were that respondent participate in a PEP assessment and comply with all recommendations, fully complete a substance abuse assessment and comply with all recommendations, demonstrate skills and lessons learned in parenting education in her interactions with the children, refrain from the use of illegal and impairing substances, submit to random drug screens, follow up with recommended medical care for herself, and obtain and maintain safe and stable housing suitable for herself

and her children.

¶ 40        The trial court's findings establish that although respondent was able to obtain safe, appropriate housing in May 2019, her progress in other aspects of her case plan was inadequate. Although she had multiple opportunities to engage in services, respondent did not take advantage of such opportunities and failed to demonstrate progress in addressing her mental health and substance abuse issues. In May 2018, respondent completed the interview portion of a substance abuse assessment, but she did not comply with the drug screen required to complete that assessment. She then tested positive for cocaine and marijuana in July 2018. In the fall of 2018, she completed another substance abuse assessment at NC Recovery, but did not complete any services. In April 2019, respondent participated in a substance abuse reassessment and was recommended for substance abuse, mental health, and medical services at Fellowship Health, but she failed to comply with those recommendations. Also in April 2019, she participated in a CCA at Southlight and was recommended to participated in SAIOP treatment. However, she only attended one session of SAIOP. She was again referred to NC Recovery for substance abuse and mental health services but did not comply with the recommendations of that program. In addition, respondent was prescribed Zoloft to address symptoms of depression, but was not compliant with that prescription.

¶ 41        The trial court's findings show that the PEP provider was no longer willing to provide an evaluation to respondent after she missed three appointments.  In lieu of a PEP assessment, respondent completed a psychological evaluation, but did not complete the psychological evaluation until December 2019, shortly before the termination hearing.  Even after completing the evaluation, she missed the interpretive session with the psychologist, which would have helped her understand the recommendations made. After two unsuccessful attempts, respondent completed one-on-one parenting education. Yet, she demonstrated that she did not understand the needs of her children. Despite being instructed to discontinue telling them they were coming "home" because Kevin's self-destructive behavior was closely correlated with her comments, she continued to make these comments. In addition, Kevin was relatively stable when he was unaware of court hearings and not told anything that would indicate he would be returning to respondent's care. However, respondent was dismissive of Kevin's mental health needs, believing that his behavior was due to his desire to return home.

¶ 42        The trial court's findings also show that since July 2018, respondent had been asked to complete twenty-four drug screens but only completed seven. Four of the screens were positive for marijuana, and one was positive for cocaine. She continued to miss drug screens, one as recently as 31 December 2019, just weeks before the

termination hearing.

¶ 43      Based on the foregoing, we conclude the trial court's findings of fact support its conclusion that respondent neglected the children, and it was probable that there would be a repetition of neglect if they were returned to her care. Because the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, see *In re A.R.A.,* 373 N.C. 190, 194 (2019), we need not address whether the trial court erred in terminating respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2).

**C.      Best Interests**

¶ 44      Respondent challenges several dispositional findings of fact and contends that the trial court abused its discretion in determining that it was in Kevin and Mary's best interests that respondent's parental rights be terminated. We conclude that the trial court did not abuse its discretion in determining that terminating respondent's parental rights was in the best interests of the children.

¶ 45      In determining whether termination of parental rights is in the best interests of a juvenile:

> The court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57 (2020). Unchallenged dispositional findings are binding on appeal. *In re Z.L.W.*, 372 N.C. at 437. A trial court's best interests determination "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6 (citing *In re D.L.W.*, 368 N.C. at 842).

In the instant case, the trial court made the following findings concerning the factors set forth in N.C.G.S. § 7B-1110(a):

1. The child, [Mary], is a two year old female[.]

2. The child, [Kevin], is a nine year old male[.]

. . . .

56. The primary plan for the children is adoption. Termination of parental rights aids in accomplishing that plan.

57. [Mary] does not have any special needs at this time.

58. [Kevin] has special needs related to treatment of his mental health issues. Many of these issues can be traced to his experiences prior to the filing of the juvenile petition, and the more significant mental health events he has experienced since coming into foster care have occurred due to statements of his mother. He currently receives intensive in-home therapy, and is prescribed Lexapro to treat his symptoms of depression and anxiety.

59. [Kevin's] mental health needs do not pose a barrier to his being successfully adopted.

60. Both the children are currently placed in prospective adoptive homes. Although they are placed separately, the prospective adoptive families are closely connected, and are part of the same church and social communities. The children currently have at least weekly contact with each other, and based on the regular activities of the prospective adoptive families, it is anticipated that this regular contact will continue.

61. [Mary] was placed in her current foster home in May 2019. She has formed a strong, positive bond with the prospective adoptive parents, and has been integrated into their family. [Mary] is noted to be more vocal, playful, and confident since moving to this home.

62. When [Mary] first came into foster care, she had a strong attachment to her mother. While the attachment continues, it has eroded due to the passage of time. [Mary] does recognize her mother, and goes to her willingly at

visits. At this time, she does not know her mother was her caregiver or provider.

. . . .

64. [Kevin] has been placed in his current foster home since August 2018. He refers to the foster parents as "mom" and "dad," and is noted to be playful and comfortable with them. [Kevin] and the foster parents regularly exchange hugs and other shows of affection. [Kevin] feels safe and loved in this home.

65. [Kevin's] foster parents are undeterred by his occasional mental health crises, and have demonstrated extraordinary commitment to him during these periods. [Kevin] required hospitalization to address his mental health, and received his treatment at Carolina Dunes, located approximately two hours away from his foster home. [Kevin] was at Carolina Dunes for nine days. At least one of his foster parents drove to and from Carolina Dunes every night during the hospitalization to visit with [Kevin].

66. Both of the children would be adoptable by other families, should an unforeseen issue impeded [sic] the current placements. [Kevin] is recognized to be loveable, outgoing, and gregarious child. [Mary] is an easy-going, happy little girl.

67. [Kevin] continues to have a strong bond with his mother, and is very affectionate with her. However, the bond is not healthy for [Kevin]. He is conflicted about his situation because he does not want to hurt his mother. [Kevin] worries for his mother's safety and well-being; he has expressed concern that she will again be homeless.

. . . .

> 69. The prospective adoptive parents of both children have indicated their willingness to maintain a relationship between the children and [respondent].
>
> 70. The conduct of the [respondent-]parents has been such as to demonstrate that they will not promote the healthy and orderly, physical and emotional well being of the children.
>
> 71. The [respondent-]parents have acted inconsistently with their Constitutionally-protected parental status.
>
> 72. The minor children are in need of a permanent plan of care at the earliest possible age which can be obtained only by the severing of the relationship between the children and their parents by termination of the parental rights of the parents.
>
> 73. It is in the best interests of the children that the parental rights of the [respondent-]parents be terminated.

First, respondent contends that in finding of fact 58, the trial court erroneously attributes Kevin's mental illness to respondent's statements and ignores the evidence of his complex mental health issues. We first note that the trial court did not attribute the entirety of Kevin's mental health issues to the statements of respondent. Instead, the trial court found that "the more significant mental health events" Kevin had experienced since coming into foster care occurred as a result of respondent's statements. This finding is supported by the WCHS social worker's testimony. The social worker testified that "a lot of increased escalation" from Kevin was observed after respondent informed Kevin that there was a possibility he would be coming

"home" prior to a 25 March 2019 hearing. There was a "behavioral pattern when those false promises were communicated to him [by respondent], that it caused [Kevin] to act out." The social worker testified that based on the "misinformation" provided by respondent, Kevin had a "very reactive" type of relationship with respondent and would have "mental health flare-ups" when he is "let down." Thus, the challenged portion of finding of fact 58 is supported by competent evidence.

¶ 48   Respondent also challenges the portion of finding of fact 62 stating that Mary's attachment to respondent had "eroded" due to the passage of time. The WCHS social worker testified that at the beginning of the case, Mary had a strong attachment to respondent and would "bawl her eyes out" for hours when she had to separate from respondent after visitations ended. He testified that "now, [Mary] knows who her mother is, and when she comes to visits, you know, she goes straight to her. . . . [T]here is a very evident bond there between the two." Although this testimony indicates that Mary continued to have a bond with respondent, it was reasonable for the trial court to infer from the testimony in this case that their bond had lessened over time, and this finding is not in error.

¶ 49   Next, respondent contends that the portion of finding of fact 67 stating that Kevin's bond with respondent "is not healthy" for Kevin is contradicted by the court's finding of fact 69 which gives a positive characterization of the adoptive parents'

"willingness to maintain a relationship between the children and [respondent]." She argues that the court's findings "do not explain why, if the bond with [respondent] is not healthy for Kevin, it is in his best interest to continue a relationship with her after his adoption." However, respondent reads too much into finding of fact 69. The trial court did not find that continuing a relationship with respondent was necessarily in Kevin's best interests. It merely observed that Kevin's prospective adoptive parents noted their willingness to maintain a relationship between Kevin and respondent.

¶ 50        Respondent further contends that although the trial court determined, in finding of fact 72 and conclusion of law 3, that the children needed a permanent plan and that it could only be accomplished by terminating her parental rights, it failed to make findings on dispositional alternatives the court considered. She also challenges the trial court's finding of fact 73 and conclusion of law 4, arguing that the court's findings do not show how termination of her parental rights was in her children's best interests.

¶ 51        Initially, we note that N.C.G.S. § 7B-1110(a) does not require the trial court to make written findings regarding any dispositional alternatives it considered. Here, the trial court's findings demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and "performed a reasoned analysis weighing those

factors." *In re Z.A.M.*, 374 N.C. at 101. The trial court found that termination of respondent's parental rights would aid in the accomplishment of the primary plan of adoption, Mary had formed a "strong, positive" bond with her prospective adoptive parents, Kevin was playful and comfortable in his foster home and felt safe and loved, and both Kevin and Mary would be adoptable by other families should an unforeseen issue impede their current placements. In addition, the trial court found that Kevin did not have a healthy bond with respondent and that the passage of time had eroded Mary's attachment to respondent. The trial court made sufficient dispositional findings and properly analyzed them. Therefore, we hold that the trial court did not abuse its discretion in concluding that termination was in Kevin and Mary's best interests. We affirm the trial court's order terminating respondent's parental rights in Kevin and Mary.

AFFIRMED.